

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **GARRY JAMES WOOMER** | § | Case No. 11-43457 |
| a/k/a Garry James Woomer, Jr. | § | |
| xxx-xx-6063 | § | |
| **and SHERIE ANN WOOMER** | § | |
| xxx-xx-7150 | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| ROBERT CONTE, | § | |
| HIGHLAND OAKS HOLDINGS, LLC | § | |
| and D. WILLIAM RYAN, in his capacity | § | |
| as the Trustee of the Ryan Family Trust | § | |
| dated June 29, 1989 | § | |
| | § | |
| Plaintiffs | § | Adversary No. 12-4017 |
| | § | |
| v. | § | |
| | § | |
| GARRY JAMES WOOMER | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

Upon trial of the complaint filed by the Plaintiffs, Robert Conte, Highland Oaks

Holdings, LLC and D. William Ryan, in his capacity as the Trustee of the Ryan Family

Trust dated June 29, 1989 (collectively the "Plaintiffs") seeking a determination of the

dischargeability of a debt allegedly owed to each of them by the Defendant-Debtor, Garry

James Woomer ("Defendant" or "Woomer"), the Court issues the following findings of

---

[1] These findings of fact and conclusions of law are not designated for publication and shall not considered as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the case or as to other applicable evidentiary doctrines.

fact and conclusions of law.  The Plaintiffs contend that the debt owed to each of them is

nondischargeable under the alternative grounds set forth in 11 U.S.C. §523(a)(2)(A),

(a)(4) and (a)(6). After the trial, the Court took the matter under advisement.  This

decision disposes of all issues pending before the Court.

## FINDINGS OF FACT

1.      On November 16, 2011, the Defendant and his spouse, Sherie Ann Woomer, filed
        a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this
        Court.

2.      Among the debts sought to be discharged by the Defendant is a debt evidenced by
        a default judgment entered against the Defendant and other parties by the 193rd
        Judicial District Court of Dallas County, Texas in cause no. DC-10-06451-L and
        styled *Robert Conte, individually, Highland Oaks Holdings, LLC, and D. William
        Ryan, Trustee of the Ryan Family Trust Dated June 29, 1989 v. AEDC, LLC,
        Garry James Woomer, Jr., individually, and Richard C. Cope, individually*, in
        which the Plaintiffs were awarded damages in the amount of $410,412.47, plus
        attorney's fees (the "State Court Judgment").[2]

3.      The indebtedness reflected in the State Court Judgment arises from the acquisition
        and subsequent operation of an apartment complex known as the Highland Oaks
        Apartments located in Fredericksburg, Texas ("Highland Oaks" or the "Property").

4.      On January 26, 2012, the Plaintiffs filed their original complaint in this adversary
        proceeding, seeking a determination that the debt established by the State Court
        Judgment should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A),
        (a)(4), or (a)(6).[3]

5.      Since no factual findings were issued in conjunction with the State Court Judgment
        to which the principles of issue preclusion could apply, the parties presented
        evidence to this Court at trial regarding the circumstances under which the various
        components of the indebtedness occurred.

_____

[2] Ex. 30.

[3] At trial, the Plaintiffs abandoned the asserted causes of action for embezzlement and/or larceny
under §523(a)(4) and for a willful and malicious injury under §523(a)(6).

6.      Plaintiff Robert Conte ("Conte") appeared at trial on behalf of himself and Highland Oaks Holdings, LLC ("HOH").  Plaintiff D. William Ryan, in his capacity as the trustee of the Ryan Family Trust Dated June 29, 1989 ("Ryan") failed to appear at the trial.

*Acquisition of the Property*

7.      The Defendant, Garry James Woomer, was at all relevant times the president of American Equities Development and Construction, Inc. ("Equities",)[4] a corporation controlled by Woomer and his father-in-law, Richard Cope ("Cope").

8.      In 2003, Equities entered into an agreement to purchase the Property from Greater Fredericksburg Apartments, LLC ("GFA").

9.      The Property was encumbered by a lien held by GMAC Commercial Mortgage ("GMAC") which secured a promissory note executed by GFA in favor of GMAC.

10.     Equities, however, did not possess sufficient funds to complete the purchase, so the Defendant, along with Cope, began to look for investors to assist them in the purchase of the Property from GFA.

11.     It was through the effort to locate investors for the acquisition of the Property that the Defendant first became acquainted with the Plaintiffs.

12.     Conte was a sophisticated investor who had considerable experience in the acquisition and operation of apartment complexes since 1976 and engaged in those operations through various forms of business entities including partnerships, joint ventures and co-tenancies.

13.     On September 18, 2003, an "Agreement of Sale and Purchase" was signed by Equities, as Seller, and Conte, as Purchaser, whereby Conte would acquire an undivided 35% of the Highland Oaks Property.[5]

14.     Article I of the Agreement of Sale and Purchase identified all of the Property that was designated to be acquired by Conte.  Included was the following provision

---

[4] ¶ 5(b) of the Agreed Issues of Fact.  The agreed issues of fact were set forth as paragraph (5) in the approved Joint Pre-Trial Order entered in this adversary proceeding on January 24, 2013.

[5] Ex. C.

which designated the personal property to be acquired by Conte in the transaction:

> (c)  All equipment, appliances, furniture, furnishings, and other personal property owned by Seller on the Land and used in connection with the Improvements (all of the foregoing are hereinafter collectively referred to as the "Personal Property").[6]

15.    Under Article II of the Agreement of Sale and Purchase, Conte agreed to pay to Equities the sum of $2,496,200.00 for the 35% interest, payable through $700,000.00 cash, plus a note for the unpaid balance.[7]

16.    Under ¶ 4.4 of the Agreement of Sale and Purchase, Conte, as the purchaser, was entitled to access to the Property as well as to the books and records pertaining to the Property prior to closing.[8]

17.    The Agreement of Sale and Purchase contained a comprehensive disclaimer regarding any representations, warranties and agreements.[9]

18.    The Agreement of Sale and Purchase contained a merger provision under which the parties agreed that the Agreement constituted the complete agreement between the parties.[10]

19.    Article V of the Agreement of Sale and Purchase designates Conte as the "1031 Exchange Agent" for Ryan in his trustee capacity.[11]

20.    The Agreement of Sale and Purchase does not designate the Defendant, nor Cope, nor Equities as a "qualified intermediary" or an "exchange accommodator" for the purposes of a §1031 exchange.[12]

---

[6]  *Id*. at p. 1.

[7]  *Id*. at p. 2.

[8]  *Id*. at p. 3.

[9]  *Id*. at ¶4.6 on p. 4.

[10]  *Id*. at ¶17.2 on p. 13.

[11]  *Id*. at p. 5.    This is actually the only documentary evidence presented that pertains to a §1031 exchange.

[12]  Generally speaking, §1031 of the Internal Revenue Code permits a deferral of tax on a gain from the disposition of a taxpayer's property if that taxpayer exchanges it for similar property.  See

21.    Subsequent to the execution of the Agreement of Sale and Purchase between Equities and Conte, the means to satisfy the purchase price under the agreement was modified to require a payment of $700,000 cash, together with the assumption of the underlying GMAC indebtedness.

22.    A similar Agreement of Sale and Purchase between Equities and Ryan for a similar 35% interest in the Property was subsequently executed in which Ryan agreed to pay $721,000 cash, together with the assumption of the underlying GMAC indebtedness.[13]

23.    In order to approve the assumption of its note, GMAC required that, in lieu of the individual purchasers, new Delaware limited liability companies must be formed to stand as the ultimate purchasers of the Property.

24.    Thus, three such LLCs were formed to act as the ultimate purchasers of the Property:  (1) Conte formed HOH; (2) Ryan formed D. William Ryan, Trustee of the Ryan Family Trust Dated June 29, 1989, LLC ("Ryan LLC"); and (3) the Defendant formed AEDC, LLC ("AEDC").

25.    The parties agreed to a two-step "simultaneous closing"under which Equities would acquire the Property from GFA, and then Equities would separately convey the Property to the three limited liability companies.

26.    The purchase of the Property was presumably structured as a two-step transaction to establish the existence of a like-kind exchange that could qualify as a tax deferred transaction under Internal Revenue Code § 1031.[14]

27.    This simultaneous closing occurred on November 14, 2003.

---

conclusions 29-40.  However, the Court was not provided sufficient evidence to determine the validity of this effort.  *See infra*, note 14.

[13] Ex. D.

[14] However, there is no evidence before the Court regarding the nature of the relinquished property, whether the relevant time periods were observed or whether other requirements were met. Thus, whether a tax deferral actually accrued as a result of this transaction, and for whose benefit such a deferral might have been produced, is not addressed by the evidence tendered by the parties.

28.   In the first closing, Equities acquired the Highland Oaks Property from GFA.[15] The transaction was funded by the cash infusions by Conte in the amount of $700,000 and Ryan in the amount of $721,000, as well as the transfer and assumption of the GMAC note by Conte, Ryan, Woomer and Cope.[16]

29.   Through the closing of the sales transaction between GFA and Equities, Equities realized cash proceeds in the amount of $309,278.07.[17]

30.   However, Equities, under the control of the Defendant, only deposited the sum of $53,559.80,[18] an amount primarily representing security deposits and prepaid rents, into the HOA operating account, and Equities retained and utilized the remaining funds of $256,087.27.

31.   Pursuant to the two-tier conveyance mechanism, the sale of the Property from Equities to the co-tenants was also closed on November 14, 2003, with HOH, LLC and Ryan, LLC each receiving a 35% undivided interest and AEDC receiving a 30% undivided interest in the Property.[19]

32.   With regard to the acquisition of the Highland Oaks Apartments, Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that the two-step "simultaneous closing" process was utilized by the Defendant to perpetrate a fraud.

33.   Notwithstanding the language of the Agreement of Sale and Purchase between them, Conte erroneously assumed that all cash sums acquired by Equities through the GFA sale would subsequently be deposited in the Highland Oaks Apartments operating account and utilized for the management and development of the Property.  However, the Agreement of Sale and Purchase between Equities and Conte does not provide for the transfer of those funds.

---

[15]  Ex. 4.  ¶ 5(e) of the Agreed Issues of Fact.

[16] ¶ 5(k) of the Agreed Issues of Fact.  Thus, while the Defendant did not contribute any funds for the acquisition of the Property, he and Cope joined Conte and Ryan in assuming obligations on the GMAC promissory note.

[17]  Ex. 7.  ¶ 5(m) of the Agreed Issues of Fact.

[18]  ¶ 5(n) of the Agreed Issues of Fact.

[19]  Ex. 5.  ¶ 5(l) of the Agreed Issues of Fact.

34. Despite his sophistication in these types of transactions, Conte admitted on cross-examination that he did not actually read the Agreement of Sale and Purchase before he signed it.

35. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that any debt owed to them respectively by the Defendant arising from the acquisition of the Highland Oaks Apartments was procured under circumstances constituting actual fraud.

36. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that the Defendant made representations to either of them pertaining to the acquisition of the Highland Oaks Apartments that the Defendant knew were false at the time that such representations were made.

37. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that the Defendant made false representations to either of them pertaining to the acquisition of the Highland Oaks Apartments with the intention and purpose of deceiving either of them.

38. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that either of them justifiably relied upon any false representations by the Defendant pertaining to the acquisition of the Highland Oaks Apartments since no such false representations were made.

39. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that the Defendant acted in a fiduciary capacity as to either of them in the acquisition of the Highland Oaks Apartments.

40. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that a trust relationship existed between the Defendant and either of them prior to the creation of any indebtedness between them arising from the acquisition of the Highland Oaks Apartments.

41. Conte and Ryan have each failed to demonstrate by a preponderance of the evidence that the Defendant appropriated any funds from either of them with a fraudulent intent in the acquisition of the Highland Oaks Apartments.

*The Co-Tenancy Agreement*

42.   In preparation for the operation of the Property,  HOH, Ryan LLC, and AEDC entered into a written "Cotenancy Agreement - Texas Properties" on or about November 13, 2003, under which the Property would be acquired and managed.[20]

43.   The Cotenancy Agreement governed the relationship of the co-tenants in the operation of the Property, which of necessity did not become operative until after the acquisition of the Property.

44.   The Cotenancy Agreement gave each cotenant a right to participate in management decisions regarding the Property,[21] but also appointed AEDC as the "Managing Cotenant" to run the day-by-day operations for the Property.[22]

45.   AEDC, as Managing Cotenant, was given specific and exclusive authority regarding such day-to-day operations of the Property, including any interaction with the mortgagee, GMAC,[23] and AEDC served as the solely-designated notice agent for the co-tenants with regard to GMAC matters.[24]

46.   AEDC was specifically appointed as an "Agent and attorney-in-fact" for the other cotenants to accomplish certain management assignments designated by the Cotenancy Agreement.[25]

47.   The Cotenancy Agreement required AEDC, as agent and attorney-in-fact for the other cotenants, to maintain a separate depository account (the "HOA Operating Account") solely for the purpose of managing the Property.[26]

48.   The Cotenancy Agreement required AEDC, as agent and attorney-in-fact for the

---

[20]  Ex. 1.  ¶ 5(g) of the Agreed Issues of Fact.

[21]  *Id*. at ¶ 4.

[22]  *Id* and ¶ 5(h) of the Agreed Issues of Fact.

[23]  Ex. 1 at ¶ 29.6.

[24]  *Id*. at ¶ 29.1.

[25]  *Id*. at ¶ 10.

[26]  *Id*. at  ¶ 10(a);  ¶ 5(i) of the Agreed Issues of Fact.

other cotenants, to collect all receivables and other amounts in connection with the operation of the Property, and deposit those receipts to the HOA Operating Account.[27]

49.     The Cotenancy Agreement required AEDC as agent and attorney-in-fact for the other cotenants, to approve and pay all standard operating costs, expenses, and other accounts payable related to the day-to-day maintenance of the Property, the construction and development subcontractors and related parties from the HOA Operating Account.[28]

50.     The Defendant, in the agreed issues of fact and in his testimony at trial, acknowledged that he was directly controlling all of the actions of AEDC in its capacity as the named Managing Cotenant under the Cotenancy Agreement.

51.     The Cotenancy Agreement provided that the cotenants would pay the operating costs in proportion to their ownership interest and that any shortfall in operating capital would be cured by the cotenants under the same formula.[29]

52.     It also provided any cotenant "may, but shall not be required", to pay the share of any operating costs not contributed by a cotenant within 30 days after notice to defaulting cotenant of a written demand to pay.  Such advance would be treated as a loan to the defaulting cotenant at a designated interest rate.[30]

53.     The Cotenancy Agreement provided that the Agreement could be amended only "by a writing, signed by each of the Cotenants."[31]

54.     The Cotenancy Agreement provided that it was "expressly understood and agreed that nothing contained herein, or in any other agreement between the Cotenants, shall be interpreted or construed to make them partners, joint ventures (sic), or participants in any other legal relationship, except for that of tenants-in-common."[32]

---

[27]  Ex. 1 at ¶ 10(b);  ¶ 5(j) of the Agreed Issues of Fact.

[28]  Ex. 1 at ¶ 10(c).

[29]  *Id*. at ¶ 8.

[30]  *Id*.

[31]  *Id*. at ¶ 18.

[32]  *Id*. at ¶ 12.

*Purported Addendum to Co-Tenancy Agreement*

55.     An Addendum to Cotenancy Agreement was executed on November 12, 2003 by Conte, the Defendant, Cope and AEDC.[33]

56.     The Addendum to the Cotenancy Agreement provided that cash generated from the Property and due to AEDC would be distributed to HOH LLC until HOH LLC received its entire initial capital contribution, along with an annualized compounded return of 8%.[34]

57.     The Addendum also provided that AEDC would be paid a 3% management fee based upon the collection of rents and when those would be paid — a provision that was not contained in, nor contemplated by, the provisions of the Cotenancy Agreement.

58.     The payment of any management fee would necessarily reduce the distributions that would be paid to all cotenants under ¶ 9 of the Cotenancy Agreement.

59.     Thus, the Cotenancy Agreement could not be properly amended to allow the payment of a management fee to AEDC without the express written consent of Ryan LLC.

60.     The purported addendum was not signed by Ryan or Ryan LLC.

61.     No evidence was produced that otherwise established that Ryan LLC consented to the payment of any management fee to AEDC as contemplated by the Addendum.

62.     The provision of the Addendum that authorized the payment of a management fee to AEDC in the post-acquisition period was unenforceable as an improper amendment to the Cotenancy Agreement for its failure to comply with ¶ 18 of the Cotenancy Agreement.

63.     Thus, no funds could be properly owed to AEDC or the Defendant arising from any entitlement to a management fee under the Cotenancy Agreement.

64.     The Addendum did not contain a severability clause.

---

[33] Ex. 2.

[34] The Addendum erroneously referenced this amount as $721,000 — not the $700,000 actually tendered by Conte.

65.     While it is theoretically possible to believe that the unenforceability of the management fee provision of the Addendum should have no effect upon the enforceability of the remaining provisions of the Addendum, it is just as feasible to believe that the Defendant, AEDC and/or Cope would not have signed the Addendum without gaining the financial benefits offered by the inclusion of the management fee provision.

66.     Conte failed to establish by a preponderance of the evidence that it was the intention of the parties for the provisions of the Addendum to be divisible and severable and thus still effective, notwithstanding the unenforceability of the management fee provision.

67.     Conte failed to establish by a preponderance of the evidence that the parties would have executed the Addendum even in the absence of the management fee provision.

*Post-Acquisition Activity*

68.     Any misconduct by the Defendant pertaining to the operation of the Property in the post-acquisition period that could constitute actual fraud for the purposes of §523(a)(2)(A) or a defalcation while acting in a fiduciary capacity under §523(a)(4) is actionable solely by HOH and Ryan LLC as the actual co-tenants affected by such misconduct.[35]

69.     Ryan LLC has made no such allegations in this adversary proceeding.  It failed to bring an affirmative claim for relief in this adversary proceeding.

70.     In light of the invalidity of the purported Addendum, Conte in his individual capacity has no standing to litigate claims that arose from the Defendant's alleged misconduct after the acquisition of the Property.  Such claims are properly owned by HOH as a co-tenant under the Cotenancy Agreement.

71.     Ryan, in his capacity as the trustee of the Ryan Family Trust Dated June 29, 1989, has no standing to litigate claims that arose from the Defendant's alleged misconduct after the acquisition of the Property.  Such claims are properly owned by Ryan, LLC as a co-tenant under the Cotenancy Agreement.

---

[35]  Nevertheless, all of the Plaintiffs' claims in this area will be addressed.

72.     HOH has failed to demonstrate by a preponderance of the evidence that any debt owed to it by the Defendant arising from the operation of the Property in the post-acquisition period was procured under circumstances constituting actual fraud.

73.     HOH has failed to demonstrate by a preponderance of the evidence that the Defendant made representations to it pertaining to the operation of the Property in the post-acquisition period that the Defendant knew were false at the time that such representations were made.

74.     Indeed, HOH and its representative did not learn about the various actions of the Defendant in the post-acquisition period of which they now complain until some years later.

75.     HOH has failed to demonstrate by a preponderance of the evidence that the Defendant made false representations to it pertaining to the operation of the Property in the post-acquisition period with the intention and purpose of deception.

76.     HOH has failed to demonstrate by a preponderance of the evidence that it justifiably relied upon any false representation of the Defendant pertaining to the operation of the Property in the post-acquisition period.

77.     Thus, any determination of non-dischargeability arising from the alleged incidents of misconduct by the Defendant arising from his control of AEDC in the operation of the Property in the post-acquisition period must be based upon §523(a)(4) and is, again, actionable only by HOH.

78.     From November, 2003 until April, 2008, AEDC managed the Property by itself or through professional management companies or consultants, such as UAH.[36]

79.     By all accounts, the rental revenues generated by the Property were often insufficient to meet required operating costs.

80.     Although the Defendant contends that Equities would loan funds to Highland Oaks Apartments when cash shortfalls occurred, such "loans" were not authorized by the Cotenancy Agreement.

---

[36] ¶ 5(o) of the Agreed Issues of Fact.

**-12-**

81.   In the event of a revenue shortfall, AEDC was under a contractual duty to notify the co-tenants regarding any such shortfall and the co-tenants were under a contractual duty to "immediately contribute their respective shares of any such deficit."[37]

82.   AEDC failed to notify the affected co-tenants regarding any revenue deficit.

83.   The failure of AEDC, as the Managing Cotenant, to issue a written demand for the co-tenants to satisfy any revenue shortfall precluded AEDC and the Defendant, or any other company under his control, from advancing funds for the benefit of the cotenancy property with an expectation of repayment.

84.   On or about December 15, 2004, the Defendant, through his control of AEDC in its capacity as the Managing Cotenant, received funds disbursed by GMAC from the Capital Reserve Account for the Property in the amount of $24,371.16.[38]

85.   Though such funds clearly constituted co-tenancy property, the Defendant did not deposit those funds into the Highland Oaks operating account,[39] but rather disbursed them for use by AEDC or Equities to the detriment of HOH.

86.   Since no management fee was properly owed to AEDC or the Defendant under the Cotenancy Agreement and its unenforceable Addendum, and since neither AEDC nor the Defendant was authorized under the Cotenancy Agreement to tender any "loans" to Highland Oaks Apartments in the event of a cash shortfall, any purported defense attempting to justify the Defendant's appropriation of the $24,371.16 as a legitimate fee, "loan repayment," or other reimbursement is without merit.

87.   The misappropriation by the Defendant, through his control of AEDC, of the $24,371.16 disbursed by GMAC from the Capital Reserve Account for the Property without the authority or knowledge of the other co-tenants, constituted a breach of fiduciary duty by the Defendant that caused injury to HOH.

---

[37] Ex. 1 at ¶ 8.

[38] ¶ 5(s) of the Agreed Issues of Fact.

[39] *Id.*

-13-

88.   As of December 23, 2005, the HOA Operating Account, then under the direct control of UAH, had funds on deposit in the amount of $24,216.23.[40]

89.   Though UAH subsequently withdrew from its management role and the account was apparently closed, HOH failed to demonstrate by a preponderance of the evidence that the Defendant misappropriated those sums or otherwise committed a breach of fiduciary duty with regard to those sums.

90.   HOH failed to demonstrate by a preponderance of the evidence that, on or about August 10, 2006, the Defendant misappropriated the sum of $13,371.81 arising from a purported disbursement by GMAC from the Capital Reserve Account for the Property.

91.   On or about April 4, 2007, the Defendant, through his control of AEDC in its capacity as the Managing Cotenant, received funds disbursed by GMAC from the Capital Reserve Account for the Property in the amount of $36,427.32.[41]

92.   Though such funds clearly constituted co-tenancy property, the Defendant did not deposit those funds into the Highland Oaks operating account and has failed to provide any accounting as to the disposition of such funds to the detriment of HOH.

93.   Since no management fee was properly owed to AEDC or the Defendant under the Cotenancy Agreement and its unenforceable Addendum, and since neither AEDC nor the Defendant was authorized under the Cotenancy Agreement to tender any "loans" to Highland Oaks Apartments in the event of a cash shortfall, any purported defense attempting to justify the Defendant's appropriation of the $36,427.32 as a legitimate fee, "loan repayment," or other reimbursement is without merit.

94.   The failure by the Defendant, through his control of AEDC, to account to the co-tenants as principals for the $36,427.32 disbursed to AEDC by GMAC from the Capital Reserve Account for the Property constituted a breach of fiduciary duty by the Defendant that caused injury to HOH.

---

[40] ¶ 5(p) of the Agreed Issues of Fact.

[41]   Ex. 22 and 23.

95.  On or about May 11, 2007, the Defendant, through his control of AEDC in its capacity as the Managing Cotenant, received funds disbursed by GMAC from the Capital Reserve Account for the Property in the amount of $2,725.59.[42]

96.  Though such funds clearly constituted co-tenancy property, the Defendant did not deposit those funds into the Highland Oaks operating account,[43] but rather disbursed them for use by AEDC or Equities to the detriment of the other co-tenants.

97.  Since no management fee was properly owed to AEDC or the Defendant under the Cotenancy Agreement and its unenforceable Addendum, and since neither AEDC nor the Defendant was authorized under the Cotenancy Agreement to tender any "loans" to Highland Oaks Apartments in the event of a cash shortfall, any purported defense attempting to justify the Defendant's appropriation of the $2,725.59 as a legitimate fee, "loan repayment," or other reimbursement is without merit.

98.  The misappropriation by the Defendant, through his control of AEDC, of the $2,725.59 disbursed by GMAC from the Capital Reserve Account for the Property without the authority or knowledge of the other co-tenants, constituted a breach of fiduciary duty by the Defendant that caused injury to HOH.

99.  On or about April 1, 2006, the Defendant, through his control of AEDC in its capacity as the Managing Cotenant, issued a check to his own company, Equities, in the amount of $5,056.86.[44]

100.  Since no management fee was properly owed to AEDC or the Defendant under the Cotenancy Agreement and its unenforceable Addendum, and since neither AEDC nor the Defendant was authorized under the Cotenancy Agreement to tender any "loans" to Highland Oaks Apartments in the event of a cash shortfall, any purported defense attempting to justify the Defendant's appropriation of the $5,056.86 as a legitimate fee, "loan repayment," or other reimbursement is without merit.

---

[42] ¶ 5(t) of the Agreed Issues of Fact.

[43] *Id.*

[44] ¶ 5(q) of the Agreed Issues of Fact.

101.    The misappropriation by the Defendant, through his control of AEDC, of the $5,056.86 disbursed to Equities on or about April 1, 2006 without the authority or knowledge of the other co-tenants, constituted a breach of a fiduciary duty by the Defendant that caused injury to HOH.

102.    On or about March 20, 2007, the Defendant, through his control of AEDC in its capacity as the Managing Cotenant, issued a check to his own company, Equities, in the amount of $20,000.00.[45]

103.    Since no management fee was properly owed to AEDC or the Defendant under the Cotenancy Agreement and its unenforceable Addendum, and since neither AEDC nor the Defendant was authorized under the Cotenancy Agreement to tender any "loans" to Highland Oaks Apartments in the event of a cash shortfall, any purported defense attempting to justify the Defendant's appropriation of the $20,000.00 as a legitimate fee, "loan repayment," or other reimbursement is without merit.

104.    The misappropriation by the Defendant, through his control of AEDC, of the $20,000.00 disbursed to Equities on or about March 20, 2007 without the authority or knowledge of the other co-tenants, constituted a breach of a fiduciary duty by the Defendant that caused injury to HOH.

105.    Each act of misappropriation by the Defendant injured HOH, as an affected co-tenant, and each act of misappropriation constituted a defalcation by the Defendant while acting in a fiduciary capacity as to HOH.[46]

106.    The aggregate amount of disbursements pertaining to the various acts of misappropriation by the Defendant in the post-acquisition period that constituted breaches of his fiduciary duty to the co-tenants is $88,580.93.

107.    In light of the invalidity of the purported addendum, the portion of the indebtedness owing by the Defendant to HOH, as a co-tenant holding a 35% interest, that is attributable to defalcation in a fiduciary capacity is $31,006.83.

---

[45] ¶ 5(r) of the Agreed Issues of Fact.

[46] "Inherent in defalcation is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation." *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 (1st Cir. 2002).

-16-

108.    The Cotenancy Agreement provided that:

> Should any action be commenced between the parties hereto
> concerning this Agreement or the rights and duties of the
> parties in relation thereto, the party prevailing in such action
> shall be entitled to reasonable attorneys fees and cost (sic) in
> such action, which shall be determined by the court in such
> action or any separate action brought for that purpose.[47]

109.    HOH incurred reasonable and necessary attorney's fees in the amount of
$36,905.98 in the prosecution of this adversary proceeding.

110.    To the extent any of these findings of fact constitute conclusions of law, the Court
expressly adopts them as such.

## CONCLUSIONS OF LAW

1.    This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C.
§523.  This Court has personal jurisdiction over the parties to this adversary
proceeding.

2.    This Court has authority to enter a final judgment in this adversary proceeding
since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C.
§157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise
of full judicial power by this Court.

3.    In seeking to except the debt owed to them from the scope of the Debtor-
Defendant's discharge, the Plaintiffs assume the burden of proof under a
preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286
(1991).

4.    All exceptions to discharge under §523 "must be strictly construed against a
creditor and liberally construed in favor of a debtor so that the debtor may be
afforded a fresh start."[48]  *In re Hudson*, 107 F.3d 355, 356 (5th Cir. 1997).

---

[47]    Ex. 1 at ¶ 24.  ¶ 5(u) of the Agreed Issues of Fact.

[48]    However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the
honest but unfortunate debtor." *Grogan*, 498 U.S. at 286-87.

5.    However, the Fifth Circuit has noted that there are limits to the maxim that
      exceptions to dischargeability are to be construed narrowly in favor of the debtor,
      particularly in situations falling under an exception to dischargeability in a case in
      which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler &*
      *Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th
      Cir. 2001).

*Applicable Texas Law*

6.    An individual stakeholder in a legal entity does not have a right to recover
      personally for harms done to the legal entity. *Wingate v. Hajdik*, 795 S.W.2d 717,
      719 (Tex.1990) [holding in a corporate context that individual stockholders have
      no separate, independent right of action for injuries suffered by the corporation].

7.    The same principle applies with regard to the rights of a member of a limited
      liability company.  The Texas Business Organization Code specifically provides
      that "[a] member of a limited liability company . . . does not have an interest in any
      specific property of the company." TEX. BUS. ORGS. CODE ANN. §101.106(b)
      (Vernon 2012).  *See BJVSD Bird Family P'ship, L.P. v. Star Elec., L.L.C.,* 2013
      WL 4080723 at *3 (Tex. App. — Houston [1st Dist.], Aug. 13, 2013).

8.    Without a breach of a legal right belonging to a plaintiff, that plaintiff has no
      standing to litigate. *See Nobles v. Marcus,* 533 S.W.2d 923, 927 (Tex.1976)
      ["Without breach of a legal right belonging to the plaintiff no cause of action can
      accrue to his benefit."]; *Asshauer v. Wells Fargo Foothill,* 263 S.W.3d 468, 471
      (Tex. App. — Dallas 2008, no pet.); *Nauslar v. Coors Brewing Co.*, 170 S.W.3d
      242, 249 (Tex.App.— Dallas 2005, no pet.). Only the person whose primary legal
      right has been breached may seek redress for an injury. *Hall v. Douglas*, 380
      S.W.3d 860, 873 (Tex. App. — Dallas 2012, no pet.).

9.    Conte in his individual capacity has no standing to litigate claims that arose from
      the Defendant's alleged misconduct after the acquisition of the Property and that is
      properly owned by HOH as a co-tenant under the Cotenancy Agreement.

10.   Ryan, in his capacity as the trustee of the Ryan Family Trust Dated June 29, 1989,
      has no standing to litigate claims that arose from the Defendant's alleged
      misconduct after the acquisition of the Property and that is properly owned by
      Ryan, LLC as a co-tenant under the Cotenancy Agreement.

-18-

*Co-Tenancy Under Texas Law*

11.   A tenancy in common is a separate, undivided possessory interest in property.
      *Cecola v. Ruley,* 12 S.W.3d 848, 853 (Tex. App. — Texarkana 2000, no pet.);
      *Dierschke v. Central Nat. Branch of First Nat. Bank at Lubbock*, 876 S.W.2d 377,
      379 (Tex. App. —  Austin 1994, no writ); *Rittgers v. Rittgers*, 802 S.W. 2d 109
      (Tex. App. —  Corpus Christi 1990, writ denied).

12.   Cotenants are required to share any income or rents generated from the jointly-
      owned property according to their respective interests, but they must also share the
      reasonable and necessary expenditures for preservation of the property. *I-10
      Colony, Inc. v. Lee*, 393 S.W.3d 467, 478-79 (Tex. App. — Houston [14th Dist.]
      2012, pet. denied); *McGehee v. Campbell*, 2010 WL 1241300 at *5 (Tex. App. —
      Houston [1st Dist] 2010, no pet.).

13.   The duty to preserve the common property rests on all of the tenants in common.
      *Gonzalez v. Gonzalez*, 552 S.W.2d 175, 181 (Tex. Civ. App. —  Corpus Christi
      1977, writ ref'd n.r.e.).  Since the care, maintenance, upkeep and preservation of
      the property rests upon the owners collectively, a tenant in common who pays
      more than his share of a debt secured by the common property or otherwise makes
      an outlay for necessary or proper preservation of the property is entitled to
      reimbursement from his cotenants to the extent that he paid their proportional
      share of the obligation. *Wooley v. West*, 391 S.W.2d 157, 160 (Tex. Civ. App. –
      Tyler 1965, writ ref'd n.r.e.); *Williams v. Mai*, 2012 WL 6644704, at *6 (Tex.
      App. —  Houston [1st Dist.], Dec. 12, 2012, no pet.).  Expenses necessary to
      preserve the common property include those for taxes, insurance and repairs. *Id.,
      Hill v. Jarvis*, 2008 WL 2571753, at *2 (Tex. App.— Tyler, June 30, 2008, pet.
      denied).

14.   A cotenant is further obligated to exercise his rights only in a manner that avoids
      injury to the rights of his cotenants, *Eternal Cemetery Corp. v. Tammen*, 342
      S.W.2d 562, 564 (Tex. Civ. App. — Fort Worth 1959, writ ref'd n.r.e.), and that
      does not interfere with a co-tenant's ownership and enjoyment of the property.
      *Dearman v. Dutschmann*, 739 S.W.2d 454, 456 (Tex. App. —  Corpus Christi
      1987, writ denied).

15.   However, notwithstanding such rights and duties, one cotenant is neither a partner
      with, nor an agent of, another cotenant and, in the absence of an express
      agreement, does not have the authority to bind another cotenant solely on the basis
      of the cotenancy relationship. *Dyer v. Cotton*, 333 S.W.3d 703, 712 (Tex. App.—
      Houston [1st Dist.] 2010, no pet); *Horlock v. Horlock*, 614 S.W.2d 478, 485 (Tex.

Civ. App. — Houston [14th Dist.] 1981, writ ref'd n.r.e.);

16.     Accordingly, in the absence of an agreement or contract creating such a relationship, there is no fiduciary or agency relationship that exists between cotenants, or tenants in common under Texas law. *Glover v. Union Pacific Ry. Co.*, 187 S.W.3d 201, 218 (Tex. App.— Texarkana 2006, pet. denied); *Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender)*, 12 F.3d 480, 486 (5th Cir.), *cert denied,* 511 U.S. 1143 (1994); *Wilson v. Wilson*, 2008 WL 2758147, at *3 (Tex. App. — Beaumont 2008, no pet.); *Scott v. Scruggs*, 824 S.W.2d 278, 282 (Tex. App. — Texarkana 1992, writ denied); *Donnan v. Atl. Richfield*, 732 S.W.2d 715, 717 (Tex. App. — Corpus Christi 1987, writ denied); *Hamman v. Ritchie*, 547 S.W.2d 698, 706 (Tex. Civ. App. — Fort Worth 1977, writ ref'd n.r.e.).

17.     The Defendant, through his control of AEDC, assumed responsibilities as the agent and attorney-in-fact for the other two co-tenants for the performance of certain management duties under the Cotenancy Agreement.[49]

18.     The Cotenancy Agreement did not create a partnership under Texas law by and among the three named co-tenants.[50]

19.     In the absence of an objection from a defendant, one co-tenant may prosecute a suit to recover for damage to the common property, but that co-tenant may only recover the amount to which he shows himself entitled according to his proportionate interest in the common property. *Scott v. Williams*, 607 S.W.2d 267, 271 (Tex. Civ. App. — Texarkana 1980, writ ref'd n.r.e.); *Hicks v. Sw. Settlement & Dev. Corp*., 188 S.W.2d 915 (Tex. Civ. App. — Beaumont 1945, writ ref'd w. o. m.).

*Severability of Contractual Provisions Under Texas Law*

20.     "A severable contract includes two or more promises which can be acted on separately such that the failure to perform one promise does not necessarily put the promisor in breach of the entire agreement." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 739 (5th Cir. 1996).

---

[49] Ex. 1 at ¶ 10.

[50] Ex. 1 at ¶ 12.

21.   "In Texas, a contract is severable when one party's performance consists of more than one distinct and separate item and the price paid by the other party is apportioned to each item."  *Petroleum Exploration Int'l, S.A. v. Canrig Drilling Techs., Ltd.*, 2009 WL 4716043 at *1, *citing Stewart Title,* 83 F.3d at 739.

22.   The issue of severability is a question of law.  *City of Beaumont v. Int'l Assoc. of Firefighters, Local Union No. 399*, 241 S.W.3d 208, 216 (Tex. App. — Beaumont 2007, no pet.); *Rogers v. Wolfson*, 763 S.W.2d 922, 924 (Tex. App. — Dallas 1989, writ denied).

23.   "Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself."  *In re Poly-America, L.P.*, 262 S.W.3d 337, 360 (Tex. 2008).

24.   The intent of the parties, as evidenced by the language of the contract, is the principal determinant of divisibility.  *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 86 (Tex. App. — Houston [14th Dist.] 1996, writ denied) (*citing Greenstein v. Simpson*, 660 S.W.2d 155, 160 (Tex. App. — Waco 1983, writ ref'd n.r.e.)); *Stewart Title,* 83 F.3d at 739.

25.   "The relevant inquiry is whether or not the parties would have entered into the agreement absent the unenforceable part."  *Stroman*, 923 S.W.2d at 86 (citing *Frankiewicz v. National Comp. Assoc.*, 633 S.W.2d 505, 507-08 (Tex. 1982).

26.   "If the intent of the parties is unclear, the court will presume the promises are dependent rather than independent."  *Stroman*, 923 S.W.2d at 86.

27.   In the absence of sufficient evidence to establish otherwise, the parties would not have entered into the Addendum to the Cotenancy Agreement absent the inclusion of the management fee provision.

28.   The unenforceable management fee provision cannot be properly severed from the remainder of the Addendum to the Cotenancy Agreement; therefore, such Addendum is unenforceable in its entirety.

*Section 1031 Exchange Transactions*

29.   If a taxpayer sells property in one transaction and purchases a replacement property from a different seller, the Internal Revenue Code treats the transactions

**-21-**

as separate and requires recognition of gain on the sale.

30.    The property owner may accomplish a tax-deferred exchange in such a circumstance, however, if the parties utilize a "qualified intermediary" and structure the transactions so that the intermediary is deemed, for tax purposes, to have acquired the taxpayer's property and transferred the purchased property to the taxpayer.

31.    Thus viewed, an exchange for purposes of § 1031 occurs because the taxpayer has exchanged its property for property of the intermediary.

32.    For the transactions to qualify as a tax-deferred exchange under § 1031 and applicable regulations, the intermediary must receive the proceeds from the sale of the taxpayer's property (such that the intermediary is treated as acquiring the property, which the intermediary then transfers to the purchaser), and the intermediary must pay the purchase price to the seller of the acquired property (such that the intermediary is treated as the owner of the acquired property that it then transfers to the taxpayer).

33.    The transactions thus effect an exchange of properties for tax purposes between the taxpayer and the intermediary that qualifies for tax-deferred treatment.

34.    Generally, the replacement property must be identified within 45 days and acquired within 180 days from the sale of the taxpayer's property. In the interim period, the taxpayer cannot have access to funds from the sale of the taxpayer's property that the intermediary receives.

35.    Accomplishing a tax-deferred exchange through an intermediary as just described requires several steps that take place under an exchange agreement executed between the owner of the property (called the exchanger) and the intermediary.

36.    The exchanger assigns the property to be sold (referred to as the relinquished property) and the contract for its sale to the intermediary, who sells it to the purchaser and receives the sales proceeds.

37.    The owner then identifies a replacement property, contracts for its purchase, and assigns the sales contract to the intermediary who acquires the replacement property and transfers it to the exchanger.

38.    For tax purposes, the exchanger is deemed to have exchanged the relinquished property for the replacement property with the intermediary.

39.    Although the intermediary is deemed to be the purchaser of the relinquished property and the seller of the replacement property, §1031 and the IRS regulations pertaining thereto permit the deeds to the properties to be executed directly between the actual buyer and seller.

40.    If the exchanger does not identify a replacement property, or if the replacement property is not acquired, within the required times, the exchange agreement ends and the intermediary is obligated to pay the exchanger the amount of the funds it received, plus applicable interest.

*Nondischargeability Under 523(a)(2)(A):  Debt Arising*
*by Fraud, False Pretenses, or False Representation.*

41.    The Plaintiffs' Complaint seeks a determination that the debt owed to them under the State Court Judgment should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

42.    11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services,  . . .  to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

43.    Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[51] the

---

[51]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three

Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

44.     The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise . . . related to a future action which does not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense].[52]

45.     Because any representation by the Defendant regarding the acquisition or operation of the Property, or any Plaintiff's expectations arising therefrom, pertained to a future event, any such statement cannot be properly characterized as a false representation or a false pretense in this Circuit.

46.     Thus, the validity of the Plaintiffs' claim under §523(a)(2)(A) in this case rests upon sufficient proof that the debt was obtained by actual fraud.

47.     To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:
           (1) the debtor made representations;
           (2) at the time they were made the debtor knew they were false;
           (3) the debtor made the representations with the intention and purpose to
                deceive the creditor;
           (4) the creditor justifiably relied on such representation; and
           (5) the creditor sustained losses as a proximate result of the representations.

        *Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court*

---

(a)(2)(A) actions strains credibility.

    [52] While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement.  *See Walker v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007); and *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).  In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party." *In re Allison*, 960 F.2d at 483; *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

*decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

48.     Because the Court concludes that the Plaintiffs have each failed to prove by a preponderance of the evidence that any amount encompassed by the State Court Judgment was obtained by actual fraud, judgment must be rendered for the Debtor-Defendant under §523(a)(2)(A).

*Nondischargeability Under §523(a)(4):*
*Debt Arising from Fraud or Defalcation*
*in a Fiduciary Capacity, Embezzlement or Larceny.*

49.     The Plaintiffs' Complaint seeks a determination that the debt owed to them under the State Court Judgment should be excepted from discharge as a debt arising from fraud or defalcation in a fiduciary capacity under §523(a)(4).

50.     11 U.S.C. §523(a)(4) states that:

(a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(4) for fraud or defalcation while acting in a fiduciary capacity,  embezzlement, or larceny.

51.     The Fifth Circuit has noted "that this discharge exception was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's." *Miller v. J.D. Abrams Inc. (Matter of Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied*, 526 U.S. 1016 (1999) (internal quotations omitted).

52.     Whether the actions of an individual were taken in a fiduciary capacity for the purposes of §523(a)(4) is determined by federal law.  *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 620 (5th Cir. 2011).

53.     However, "state law is important in determining whether or not a trust obligation exists." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 350 (5th Cir. 2004).

-25-

54.    The Fifth Circuit has discussed the concept of a fiduciary under §523(a)(4) in the following terms:

> [T]he concept of fiduciary under §523(a)(4) is narrower than it is under general common law.  Under §523(a)(4), "fiduciary" is limited to instances involving express or technical trusts.  The purported trustee's duties must, therefore, arise independent of any contractual obligation.  The trustee's obligations, moreover, must have been imposed prior to, rather than by virtue of, any claimed misappropriation or wrong.  Constructive trusts or trusts *ex malificio* thus also fall short of the requirements of §523(a)(4).
>
> . . . Statutory trusts, by contrast, can satisfy the dictates of §523(a)(4).  It is not enough, however, that a statute purports to create a trust:  A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary."  Rather, to meet the requirements of §523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

*Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339, 342-43 (5th Cir. 1998).

55.    Thus, the trust relationship must exist prior to the creation of, and without reference to, the indebtedness in question.  *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1338 (5th Cir. 1980).

56.    "[T]he Fifth Circuit recognizes that the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law."  *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366, 393 (Bankr. E.D. Tex. 2009) (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 898 F.2d 779, 784-85 (5th Cir.), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993)).

57.    Thus, federal courts in this context have "not hesitated to conclude that debts arising from misappropriation by persons serving in a traditional, pre-existing fiduciary capacity, as understood by state law principles, are nondischargeable."  *Gupta*, 394 F.3d at 350.

58.  There are two general categories of fiduciary relationships recognized under Texas law.

59.  One category is a formal fiduciary relationship that arises as a matter of law, and includes relationships between attorney and client, principal and agent, partners, and joint venturers. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002).

60.  There is no formal fiduciary or agency relationship that exists between cotenants, or tenants in common under Texas law, in the absence of an agreement or contract creating such a relationship. *Glover v. Union Pacific Ry. Co.*, 187 S.W.3d 201, 218 (Tex. App. — Texarkana 2006, pet. denied); *Scott v. Scruggs*, 824 S.W.2d 278, 282 (Tex. App. — Texarkana 1992, writ denied); *Donnan v. Atl. Richfield*, 732 S.W.2d 715, 717 (Tex. App. — Corpus Christi 1987, writ denied); *Horlock v. Horlock*, 614 S.W.2d 478, 485 (Tex. Civ. App. — Houston [14th Dist.] 1981, writ ref'd n.r.e.); *Hamman v. Ritchie*, 547 S.W.2d 698, 706 (Tex. Civ. App. — Fort Worth 1977, writ ref'd n.r.e.).

61.  Section 10 of the Cotenancy Agreement designated that AEDC, under the control of the Defendant, would act as agent and attorney-in-fact for the other two non-resident co-tenants.

62.  The appointment of an attorney-in-fact creates an agency relationship. *Franks v. Roades*, 310 S.W.3d 615, 625 (Tex. App. — Corpus Christi 2010, no pet.); *Sassen v. Tanglegrove Townhouse Condo. Ass'n*, 877 S.W.2d 489, 492 (Tex. App. — Texarkana 1994, writ denied), citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992).

63.  The relationship between agent and principal is a formal fiduciary relationship. *SJW Property Commerce, Inc. v. SW Pinnacle Properties, Inc.*, 328 S.W.3d 121, 155 (Tex. App. — Corpus Christi 2010, pet. denied).

64.  "An agent is one who is authorized by a person or entity to transact business or manage some affair for the person or entity." *Id. (citing Welch v. Coca–Cola Enters., Inc.*, 36 S.W.3d 532, 539 (Tex. App.— Tyler 2000, pet. withdrawn)).

65.  "The critical element of an agency relationship is the right to control, and the principal must have control of both the means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." *McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 829 (Tex. App. — Dallas 2010, no pet.).

-27-

66.   Texas law has historically recognized that a principal-agent relationship gives rise to a fiduciary duty as a matter of law.  *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex. 2002); *Crim Truck,* 823 S.W.2d at 593-94; *Harding Co. v. Sendero Res., Inc.*, 365 S.W.3d 732, 743 (Tex. App. — Texarkana 2012, pet. denied).

67.   "It is the law that in such instances if the fiduciary takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received." *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 872 (Tex. 2010) (quoting *Kinzbach Tool Co. v. Corbett–Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942)).

68.   "An agent must fulfill its duties with reasonable care, diligence, good faith, and judgment, and if it fails to do so, it will be liable to its principal for the resulting damage."  *Sassen*, 877 S.W.2d at 492 (citing RESTATEMENT (SECOND) OF AGENCY § 401 (1958)).

69.   Under Texas law, the Defendant in this case acted in a fiduciary capacity as to the other co-tenants.

70.   Until recently, a defalcation under §523(a)(4) in this circuit required the establishment of a "willful neglect of duty" that was "essentially a recklessness standard."  *Schwager v. Fallas (In re Schwager),* 121 F.3d 177, 185 (5th Cir. 1997).

71.   Willfulness in that context had been "measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known."  *Harwood*, 637 F.3d at 624 (citing *Office of Thrift Supervision v. Felt (In re Felt)*, 255 F.3d 220, 226 (5th Cir. 2001)).

72.   However, the United States Supreme Court has recently rejected an objective recklessness standard in favor of a heightened culpability standard for defalcation in this context.

73.   In a unanimous decision in *Bullock v. BankChampaign, N.A.*, ___U.S.___, 133 S.Ct. 1754 (2013), issued on May 13, 2013, the Supreme Court declared that "defalcation" for the purposes of §523(a)(4) "includes a culpable state of mind requirement" involving "knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  *Id*. at 1757.

74.     According to *Bullock*, "where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term [defalcation] requires an intentional wrong." *Id*. at 1759.  Such an intentional wrong encompasses not only conduct which the fiduciary knows is improper, but it also encompasses reckless conduct, such as when a fiduciary "consciously disregards (or is willfully blind to) a substantial and unjustifiable risk" that his conduct will result in a breach of fiduciary duty.  *Id.*

75.     In seeking to require a higher degree of fault for a finding of a defalcation, similar to its "statutory neighbors" of fraud, embezzlement and larceny listed in §523(a)(4), without imposing an actual requirement of specific intent to establish a defalcation, the Supreme Court adopted a standard of recklessness "of the kind set forth in the Model Penal Code §2.02(2)(c)."[53]

76.     Acknowledging that its adoption of this heightened level of culpability for defalcation cases under §523(a)(4) had been recognized earlier in bankruptcy jurisprudence from the First and Second Circuit,[54] the Court further noted with approval that this "severe recklessness" standard tracks the showing required to demonstrate scienter in federal securities cases.[55]

77.     Utilizing the MPC definition of recklessness and analyzing the defalcation standard to scienter determinations in federal securities cases is an effort to exclude that type of recklessness arising as a consequence of mere negligence or inadvertence.

---

[53]  Model Penal Code §2.02(2)(c) states that:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

MODEL PENAL CODE § 2.02(2)(c) (Thomson Reuters, Westlaw through 2012).

[54]  *See, e.g.*, *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9 (1st Cir. 2002); *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 69 (2nd Cir. 2007).

[55]  Scienter, in the context of securities fraud, is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).

78.  As recognized in securities law cases in the Fifth Circuit, this type of "severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involved not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care, and that present a danger of misleading buyers or sellers [of securities] which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).

79.  Thus, such a heightened culpability requirement will ensure that the "harsh sanction of non-dischargeability is reserved for those who exhibits some portion of misconduct." *Hyman*, 502 F.3d at 68-69.

80.  As a result of the Defendant's actual intent to misappropriate assets through the auspices of AEDC in contravention of the rights of the other co-tenants, his extreme recklessness in failing to prevent the unauthorized dissipation of co-tenancy funds by AEDC, and his failure to account for all funds entrusted to AEDC as the Managing Co-Tenant, as set forth in greater detail in the findings of fact, an aggregate debt of $31,003.33 is owed by the Defendant to Highland Oaks Holdings, L.L.C. arising from defalcations[56] committed while acting in a fiduciary capacity.

*Attorney's Fees, Interest, and Court Costs*

81.  With regard to the non-dischargeability of attorney's fees and interest awarded to the plaintiffs in the State Court Judgment, "the status of ancillary obligations such as attorney's fees and interest depends on that of the primary debt.  When the primary debt is nondischargeable ..., the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir. 1996); see also *Cohen v. de la Cruz,* 523 U.S. 213, 218 (1998).

82.  Only Highland Oaks Holdings, LLC holds any claim that is nondischargeable in this case and the nondischargeable portion comprises only approximately 7.5% of

---

[56] In applying the heightened standard expressed in *Bullock* and in concluding that, even under that heightened standard, the Defendant has committed a defalcation under the circumstances of this case, the Defendant's conduct clearly constituted a "willful neglect of duty" and met the lower objective recklessness standard expressed in *Harwood* and *Schwager* to establish a defalcation. Because a defalcation is established under either analysis, the Court believes that it is proper to utilize the *Bullock* defalcation analysis in this context, notwithstanding its earlier recognition that only the circuit can overrule its own precedents.

the claim previously awarded to HOH in the State Court Judgment.

83.    When only a portion of an established indebtedness is declared nondischargeable,
       courts have held that attorneys' fees are nondischargeable in the same proportion as
       the compensatory damages are held to be nondischargeable. *Belfor USA Group,
       Inc. v Hopkins (In re Hopkins),* 469 B.R. 319, 326 (Bankr. W.D. Mo. 2012);
       *Integrated Practice Mgmt Inc. v. Olson (In re Olson)*, 325 B.R. 791, 802 (Bankr.
       N.D. Iowa 2005). *See also In re Hunter*, 771 F.2d 1126, 1131 (8th Cir.1985)
       [holding that the plaintiff may be entitled to recover attorneys' fees ancillary to the
       portion of the debt that was nondischargeable, "or those charges may be subject to
       apportionment between the dischargeable and nondischargeable parts of the
       underlying indebtedness."].

84.    Since only approximately 7.5% of the underlying indebtedness owed to HOH
       arising from the State Court Judgment is nondischargeable, the same percentage of
       the $17,210.00 in attorney's fees awarded to the Plaintiff, Highland Oaks
       Holdings, LLC, in the State Court Judgment should be deemed nondischargeable
       under the well-established jurisprudence that an award of attorneys' fees
       attributable to efforts to secure a determination that a particular debt is
       nondischargeable also renders those fees nondischargeable. *Gober,* 100 F.3d at
       1208*; Luce v. First Equipment Leasing Corp. (Matter of Luce)*, 960 F.2d 1277,
       1286 (5th Cir. 1992); *Viking Dynamics, Ltd. v. O'Neill (In re O'Neill)*, 260 B.R.
       122, 129-30 (Bankr. E.D. Tex. 2001).

85.    Thus, Highland Oaks Holdings, LLC is entitled to recover the proportional sum of
       $1,290.75 in attorney's fees which will be declared nondischargeable under
       §523(a)(4).

86.    As to recovery of attorney's fees for services rendered in the prosecution of this
       adversary proceeding, with limited exceptions, state law controls whether
       attorney's fees are recoverable and reasonable, and Texas law permits an award of
       attorney's fees only if authorized by statute or contract. *Intercontinental Group
       P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 653 (Tex. 2009).

87.    Chapter 38 of the Texas Civil Practice and Remedies Code authorizes a recovery
       of attorney's fees in certain types of lawsuits, such as suits on a sworn account or a
       written contracts. See 2A TEX. CIV. PRAC. & REM. CODE §38.001, et seq. (Vernon
       2008).[57]

---

[57]  Texas law provides that a party may recover reasonable attorney's fees on a claim based on an
oral or written contract by complying with the following requirements: (1) the claimant must be
represented by an attorney; (2) the claimant must present the claim to the opposing party or to a duly

88.   However, "parties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38." *Intercontinental Group*, 295 S.W.3d at 653.

89.   In the absence of a contractual provision stating otherwise, "to qualify as a prevailing party, a . . . plaintiff must obtain at least some relief on the merits of his claim." *Id*. at 654.

90.   "In short, a plaintiff prevails when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.*

91.   Plaintiff, Highland Oaks Holdings, LLC, is the only prevailing party in this litigation and it incurred reasonable and necessary attorney's fees in this litigation in the amount of $36,905.00.

92.   Since only approximately 7.5% of the underlying indebtedness due and owing to HOH arising from the State Court Judgment is nondischargeable, the same percentage should apply to the nondischargeable recovery of attorney's fees awarded to the Plaintiff, Highland Oaks Holdings, LLC, for services rendered in this adversary proceeding since it is the only part of the State Court Judgment that is attributable to the Defendant's misconduct and is therefore recoverable by a party prevailing in this litigation.

93.   Plaintiff, Highland Oaks Holdings, LLC, is entitled to an additional award of $2,767.88 in attorneys' fees against the Defendant, Garry James Woomer, arising from services rendered with regard to this adversary proceeding.

94.   The Defendant is not a prevailing party in this litigation and is not entitled to an award of attorney's fees against any of the Plaintiffs.

95.   This adversary proceeding is not "an action concerning this [Co-Tenancy] Agreement or the rights and duties of the parties in relation thereto."[58]  Those rights and duties were determined by the state court in its State Court Judgment

---

authorized agent of the opposing party; and (3) payment for the just amount owed must not have been tendered within thirty days of presentment.  2A TEX. CIV. PRAC. & REM. CODE ANN. § 38.002 (Vernon 2008).  No particular form of presentment is required, and it may be written or oral.  *See Harrison v. Gemdrill Intern., Inc.*, 981 S.W.2d 714, 719 (Tex.App.– Houston [1st Dist.] 1998, pet. denied) ["[A]ll that is necessary is that a party show that its assertion of a debt or claim and a request for compliance was made to the opposing party, and the opposing party refused to pay the claim."].

[58] *See supra* finding of fact ¶108.

and it declared the Plaintiffs to be the prevailing parties in the action regarding performance under the Agreement by issuing its award of attorney's fees against the Defendant.

96.   This proceeding is an action to determine whether those damages previously assessed against the Defendant in the State Court Judgment should be rendered nondischargeable.

97.   This proceeding would not be necessary and this action would not have been "commenced," if the Defendant had not affirmatively sought bankruptcy relief.

98.   The prosecution of this adversary proceeding to determine the dischargeability of the debt previously established by the State Court Judgment cannot properly be characterized as an action "concerning this Agreement" between the parties.

99.   The prosecution of this adversary proceeding to determine the dischargeability of the debt previously established by the State Court Judgment cannot properly subject the Plaintiffs to the risk of an award of attorney's fees under the Agreement because such a determination would not have been required had it not been for the Defendant's affirmative election to seek a discharge of the indebtedness previously assessed by the state court in its State Court Judgment.

100.   There is no corresponding federal statute that would authorize any award of attorney's fees to the Defendant under these circumstances.

101.   Accordingly, all relief sought by the Defendant's counterclaim is denied.

102.   Court costs of $293.00 incurred in this adversary proceeding are awarded to Plaintiff, Highland Oaks Holdings, LLC, to be paid by the Defendant, Garry James Woomer.


### CONCLUSION

103.   Therefore, the following amounts due and owing by the Defendant, Garry James Woomer, to the Plaintiff, Highland Oaks Holdings, LLC, are hereby excepted from the discharge of the Defendant, Garry James Woomer, as a debt arising from a defalcation in a fiduciary capacity pursuant to 11 U.S.C. §523(a)(4):

(a)   $32,293.75 of the debt due and owing by the Defendant, Garry James Woomer, to the Plaintiff, Highland Oaks Holdings, LLC, arising from the entry of the State Court Judgment on December 6, 2010, plus all post-

judgment interest that has accrued upon that particular sum at 5% per annum as awarded by the State Court Judgment since December 6, 2010 until paid;

(b)     an additional award of attorney's fees and court costs incurred in this action in the respective amounts of $2,767.88, and $293.00, with post-judgment interest at the federal post-judgment interest rate of 0.10% to accrue upon that aggregate sum of $3,060.88 from October 4, 2013 until paid.

104.    All other relief requested in the Plaintiffs' Complaint in the above-referenced adversary proceeding shall be denied.

105.    All relief requested by the Defendant's counterclaim in the above-referenced adversary proceeding shall be denied.

106.    To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

107.    An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 10/07/2013

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE